Statement of the case.

[No. 1542.]

FRANK SMITH v. THE STATE.

1. SELF-DEFENSE.—It is a well settled principle of law that, if at the time
   of the killing the conduct of the deceased, viewed in the light of all the
   circumstances, was such as to create in the mind of the defendant a
   reasonable apprehension of death or serious bodily injury, the defendant
   would have the right to kill, whether the danger was real or apparent.
   Note in the opinion evidence which brings this case within this rule.

2. SAME—THREATS.—Even on the hypothesis that the defendant had made
   antecedent threats against the life of the deceased, and that the deceased,
   on account of such threats, attacked the defendant in such manner as was
   calculated to induce him to believe his life in danger, this would not
   operate to deprive the defendant of his right of self-defense.

3. SAME.—But if, by threats or otherwise, the defendant intended to and
   did produce the occasion or difficulty, with the view and purpose of kill-
   ing the deceased, his right of self-defense is lost.   Note a state of case in
   which no such phase is presented.

4. SAME—MALICE.—It was insisted in this case that the antecedent threats
   of the defendant proved the homicide to have been committed upon
   former grudges, and that therefore the defendant did not believe himself
   in danger, and that the killing was upon malice.   Held, that such doc-
   trine is in violation of the rule that, when left to presumption, the last
   provocation must be presumed to be the moving cause.

5. MANSLAUGHTER—"ADEQUATE CAUSE"—PRACTICE.—Insulting language
   toward a female relation is made "adequate cause," by the fourth sub-
   division of Article 597 of the Penal Code.   Note the language used to-
   ward the wife of the defendant by the deceased which demanded of the
   court a charge in harmony with the article referred to; but note also
   that, as the charge given was not excepted to, and as no special charge
   on the subject was asked, the omission is not revisable error.

6. MURDER—FACT CASE—EVIDENCE.—See evidence held insufficient to
   sustain a conviction for murder of the second degree.

APPEAL from the District Court of Washington.   Tried below
before the Hon. I. B. McFarland.

For the killing of Robert F. Tamplin, in Washington county,
on the eleventh day of May, 1883, the appellant was convicted
of murder in the second degree, and was awarded a term of ten
years in the penitentiary as punishment.

Henry Benjamin, colored, was the first witness for the State.
He testified that at the time of the homicide the defendant lived

near Mr. Clampitt's large house, and between that house and Johnson's. Just before the shooting of the deceased, the witness, who was traveling along the road from Johnson's to Clampitt's, saw the deceased driving in his buggy by the fence. The defendant was walking a little in advance and a little to one side of him, and carried two rocks in his hands. The deceased was then cursing the defendant, and threatening to kill him that evening. He (deceased) denounced the defendant as a "G—d d—d one eyed son of a b—h." When the defendant reached his front gate, about one hundred and fifty yards distant from Clampitt's, he dropped the two stones, and went into his yard. The house stands some fifteen or twenty steps distant from the front gate. The defendant's wife was standing on the gallery when the defendant entered the yard. The deceased drove his buggy up in front of the gate, stopped, and again cursed the defendant, and again threatened to kill him that evening. Witness did not hear the defendant say a word.

At this point the deceased, who appeared to be very angry, drove his buggy a short distance below the gate and called to the witness to hold his horses, so that he could get out of the buggy and shoot the defendant, whom he again denounced as a "G—d d—d son of a b—h;" for which service he offered to pay the witness. The witness declined, and thereupon the deceased turned his horses and drove back to the gate, saying: "I will kill him now." He again requested the witness to hold his horses, and the defendant's wife thereupon asked the witness: "Are you going to hold his horses and let him kill my husband?" Witness walked up to the fence some fifteen or twenty steps and stopped. The defendant was then standing out in the yard near the gallery, with his gun, which he secured from the house when the deceased wheeled his horses to return to the gate. His wife was in front of him, trying to prevent him from shooting. The deceased drove his buggy near up to the gate, stopped, again cursed the defendant, and said that he would kill him, the defendant. He let his buggy top half down, took the reins in his left hand, and told the defendant's wife, who was standing between him and the defendant, to get out of the way; that the defendant would dirt no more cotton for her. The wife still maintained her position in front of defendant, and the deceased said to her: "Get out of the way, you big bellied b—h; it is a pity to kill three to get one;" at the same time throwing his right hand under the cushion on the buggy seat. Thereupon the de-

fendant said, speaking to his wife: "Get out of the way; don't you hear Mr. Tamplin say he will kill both of us?" Instantly he threw up his gun and fired, and the horses ran by the witness with the buggy and stopped at the fence at Clampitt's house.

The defendant lived on the right hand side of the road leading from Independence to Brenham. The fence makes an elbow from the road in front of defendant's house. The road by the defendant's house ran along the opposite side of the fence from the house. There is a path running down by the right hand side of the road, next to the fence, to the defendant's house, and into the open space in front of the house made by the elbow in the fence. When the witness first saw the defendant and the deceased they were traveling this path toward defendant's house. The weapon used by the defendant was a double barreled shot gun. This all occurred in Washington county, Texas.

Doctor R. A. Walkins testified, for the State, that he examined the wounds of the deceased after his death. They appeared to to have been made by buck shot. There were nine wounds in all. Four passed through the heart, one was in the elbow and one grazed the chin. The shot ranged somewhat upward, and entered rather on the side, and indicated that the deceased, when shot, was leaning slightly to the right. Four shot entered the body in a right line from the shoulder to the hip, within a circle of three inches, and did not come out. One shot penetrated the left thigh; one entered just above and in front of the ear, and came out on the right of the nose, under the eye; one struck the back part of the left arm just above the elbow, and came out in front, breaking the bone. The wounds were necessarily fatal. The deceased could not have lived above a minute.

Asa Sapp, the next witness for the State, testified that some two weeks before the killing, at Bishop's mills, he heard the defendant say that if the deceased did not quit fooling with him he would fill him full of buck shot. At that time the defendant was talking to another party, and not to the witness. The witness heard the remark as he passed the two parties, who, at the time, were standing by their horses a few steps distant from the mill. Witness was positive that the man who made that threat was the defendant. He afterwards saw the defendant and recognized him as the man who made the threat. Witness did not know the party to whom the defendant was talking when he said he would fill the deceased full of buck shot, etc.

Bill Peterson testified, for the State, that he lived on the de-

ceased's place as a tenant.    Sometime during the spring of 1883, about cotton planting time, the defendant came to his house to get some collards.    While there he told the witness that he and the deceased had had several difficulties—"fusses"—and that at the next one he would kill the deceased or the deceased would have to kill him.    Witness lived about a mile and a half from the defendant, who lived on Clampitt's place.    Amanda Marsh was present when the defendant made the threat above quoted. It was about dinner time when this occurred.    Defendant did not enter the house, nor did he stay long.

Witness knew Mr. Robert Tamplin, the son of the deceased. Mr. Robert Tamplin did not hire him to testify that the defendant had threatened to kill the deceased.    He did not give the witness any money before the witness went before the grand jury in this case.    He did not send for the witness to come to his house for the purpose of hiring him to testify in this case, some three weeks before the grand jury met.    The defendant went on the deceased's place as often as he liked, and, though deceased knew it, he did not object.    Witness was still a tenant on the place of deceased.

Amanda Marsh testified substantially to the same effect as did the witness Peterson, with whom she lived, except that she said the words used by defendant on the occasion referred to were: " I will kill Mr. Tamplin the first chance I get."    Defendant came to Peterson's on that occasion to get some collard plants, but he got none.    Kate Fulcher was not present.    The State here closed.

Martha Smith, the wife of the defendant, testified, in his behalf, that she was present when the defendant shot and killed the deceased.    The defendant came home from the field about noon, and with two buckets went for water.    The well where he procured water was in front of Ben. Carter's house.    Carter lived below Clampitt's house in the direction of Independence from defendant's house, and on the Independence and Gay Hill road. Some time after the defendant left with the buckets, the witness heard cursing and loud talking up the road.    Going out to the gallery, she saw the defendant coming down by the right hand side of the fence, with two stones in his hands.    The deceased was driving in his buggy at one side of the defendant.    He was cursing the defendant and threatening to kill him that evening. The deceased was not on the road, but was driving along the line of fence, following the defendant.    He followed the defendant up to the front gate of his, defendant's, yard, when the de-

fendant dropped the stones and went into the yard. The deceased stopped at the gate, and said that he would kill the defendant that evening, denounced him as a "G—d d—d son of a b—h," and said that the defendant should do no more work. The defendant stepped up on the gallery. The deceased then drove his buggy a short piece below the gate and turned and came back, cursing the defendant the while, and saying: "I will kill you now, you G—d d—d son of a b—h."

While the deceased was driving back to the gate, the defendant came out of the house with his gun. He had not had the gun in his hands before, during the difficulty. The witness saw Henry Benjamin before the deceased started back. He and deceased came up to the gate about the same time. The deceased called to Benjamin to hold his horses until he could get out of his buggy and shoot the "G—d d—d son of a b—h." Witness thereupon asked Benjamin if he was going to hold the horses so that the deceased might kill the defendant, and Benjamin walked off to the corner of the fence. Witness had placed herself between the deceased and the defendant. She asked deceased to go away and not molest the defendant, but, in reply, the deceased said, as he let down his buggy top: "G—d d—n him, I am going to kill him; he will dirt no more cotton for you. I would have killed him before now if you had not been in the way." He then said to witness: "Get out of the way, you G—d d—d big bellied bitch; it's a pity to kill three to get one." The deceased, holding the lines in his left hand, then threw his right hand under his buggy cushion. At this juncture the defendant said to witness: "Get out of the way; don't you see he is going to shoot us both?" and stepping aside, he fired the fatal shot. The horses ran with the buggy to Clampitt's yard fence, about one hundred yards distant, and stopped. The witness endeavored to prevent the shooting.

Ann Nelson testified, for the defense, that she lived on Clampitt's place, near the defendant's house, and between that house and Carter's. While eating dinner on the day of the homicide, she heard loud talking and cursing outside, and went into the yard to see what the occasion of it was. She saw the defendant, with a bucket of water in each hand, coming in the direction of his house. Deceased was following him in his buggy, cursing him, and threatening to kill him that evening. When the parties got opposite the witness's gate, the defendant said to the deceased, "I did not say so." The deceased then turned his

buggy to the left of the road, stood up and said, "I am going to get out and shoot your G—d d—d heart out." Thereupon the defendant sat his buckets of water on the ground near witness's gate, picked up two stones, and walked on toward home, going the line of the wire fence. The deceased followed, cursing the defendant, and threatening to kill him, as, he said, he ought to have done long before. When all of this occurred, the witness was but a short space distant from the parties.

When the parties went off toward the defendant's house, the witness went through her yard to a stable, about fifty yards distant from the defendant's house, and saw the defendant walking toward his house, and the deceased following and cursing him, and still threatening to kill him that evening. The narrative of this witness, from this point until the fatal shot was fired, is essentially the same as that given by the witness Martha Smith.

She stated, in addition, that when the deceased was shot, his head fell back, and the lines slipped from his hands to the doubletree of the buggy. At the time he was shot he was facing the defendant. When he threw his right hand back to the cushion, he turned his face from the defendant, and inclined his body a little to the right. He was sitting bolt upright when shot. Benjamin was closer to the parties at the time of the homicide than the witness. At the same time, the witness's brother, Pete Jones, was sitting on the fence below the stable. Witness's husband was at the table in the house when the row was first heard, and went with the witness to the yard. He did not touch the body before the inquest. Carter went to Independence for Mr. Clampitt, immediately after th shooting. If any one touched the body before Clampitt arrived, witness did not know it. Witness was in no wise related to the defendant, and had known him but for eight or nine months.

The substance of the testimony of Bob Hirston, a witness for the defense, was that a short time before the shooting he saw the deceased, who was in his buggy, and stopped at witness's house, near the well described by a previous witness. He appeared to be somewhat in liquor, and had a bottle about two-thirds full of whisky with him. Witness took a drink, then the deceased drank, and finally the two and another man drank what whisky there was in the bottle. Noticing two men at the well, the deceased asked who they were, and witness replied: "Frank Smith and Ben. Carter." Deceased then said: "Frank Smith is

the yellow, one eyed son of a b——h I want to see," and whipped up his horses, driving rapidly toward the well.

The testimony of Pete Jones, a witness for the defense, was, in every detail, the same as that of the witness Ann Nelson. Likewise was that of Charley Nelson, the husband of the witness Ann Nelson, as to what transpired from the time that he, his wife and Pete Jones came out of the house until, the parties having passed the house, the defendant dropped the stones. Witness stopped near the buggy house in his yard, and did not see the shooting. He heard the report of the gun, and saw the horses run up to Clampitt's fence, near the buggy house, where he, the witness, was standing. The deceased was sitting in the buggy, dead, with his head thrown back. Witness did not touch the body, nor go up to the buggy, as he wanted nothing to do with the matter, and besides he had understood that it was unlawful to touch the body of a man killed before the arrival of the coroner.

Kate Fulcher testified, for the defense, that she was dining with Bill Peterson and Amanda Marsh, at their home, on the day that defendant went to that house for collard plants. She arrived at the house in advance of the defendant. Defendant did not go inside of the house. He at no time while there on that occasion mentioned the name of the deceased. He did not say that he would kill deceased the first chance he got, nor did he make any threat against deceased. While he was at the house the witness was near enough to hear, and did hear all that he said, and if he had made the threats imputed to him witness would have heard them. Defendant remained at Peterson's but a short time, and left in company with witness.

Frank Clampitt, testifying for the defense, stated that he trailed the buggy over the route described by the witnesses. He saw the deceased that morning in Independence, and noticed that he was drinking somewhat. He had two bottles of whisky in his buggy when he started home that morning. He was generally a quiet, peaceable man, but quarrelsome when in liquor. The defendant was well known to the witness. He had always borne the reputation of a quiet, peaceable, law abiding man.

Bill Peterson, recalled by the defense, was asked if, when under the rule, he did not say to Bob Hirston: "I don't know what in the h——ll they want with me as a witness, any way. I only said what Robert Tamplin, jr., told me to say, and didn't tell

all of that.   I reckon he is as mad as h—ll about it."   Witness denied that he had done so.

Bob Hirston, recalled by the defense, asserted positively that Bill Peterson, while under the rule, did make the statement imputed to him, and which on the stand he denied having made.

The charge of the court and the sufficiency of the evidence to support the conviction were the grounds relied upon in the motion for a new trial.

No brief for appellant has reached the Reporters.

*J. H. Burts,* Assistant Attorney General, for the State.

HURT, JUDGE.   Under an indictment charging him with the murder of Robert F. Tamplin, the appellant was convicted of murder in the second degree, and was awarded a term of ten years in the penitentiary.

The facts immediately attending the homicide were substantially these: The defendant, having procured two buckets of water at a well a short distance from his house, was returning home with them on foot, when, at some point between the well and his house, and near a fence off the road, he was overtaken by the deceased, driving in a buggy.   The deceased, following him in his buggy, cursed him *en route,* declaring that he would kill the defendant before evening, and denouncing him as a " G—d d—d one eyed son of a b—h."   Before reaching his house the defendant set his two buckets of water on the ground near the fence, and picked up two rocks instead, which he carried with him as far as his gate, where he dropped them and entered his yard.   The deceased drove up to the defendant's front gate, where he stopped and again cursed the defendant, and declared that he would kill the defendant that evening.   The deceased then drove his buggy to a point a few steps below the gate, and proposed to hire a party present to hold his horses so that he could get out and shoot the " d—d son of a b—h."   Failing in this, he turned his horses and drove back to the front gate, cursing the defendant, and saying that he would kill him then.   The defendant, when the deceased turned back to the gate, went into his house and secured his double barreled shot gun, and with his wife returned to the yard.   The wife at this time was standing in front of the defendant, and between him and the deceased.   The deceased lowered his buggy top, and told the de-

fendant's wife, who was still standing before him, to get out of the way; that the defendant would dirt no more cotton for her. The defendant's wife not obeying this command, the deceased repeated it, with the words: "Get out of the way, you big bellied bitch; it is a pity to kill three to get one," at the same time throwing his hand behind him and under his buggy cushion. The defendant then said to his wife: "Get out of the way; don't you hear Mr. Tamplin say he will kill us all," and fired upon the defendant with fatal effect. This state of facts is not only deduced from the testimony of the witness for the State, but as well from that of four or five others who, at the time, were in full view of the homicide; nor is the correctness of this statement of the facts questioned from any source whatever.

It is a well-settled rule of law that if, at the time of the killing, the conduct of the deceased, viewed in the light of all the circumstances, was such as to create in the mind of the defendant a reasonable apprehension of death or serious bodily injury, the defendant would have the right to kill, whether the danger was real or apparent.

Was the conduct of the deceased in this case of such character as was reasonably calculated to create in the mind of the defendant this apprehension of death or serious bodily harm? Could any other inference be drawn from his conduct than that he intended to murder the defendant? Was not this the only reasonable conclusion which could be made from the facts? If so, is it not reasonable and just to presume that the defendant believed his life to be in danger, and shot his adversary to save his life? If there be any force in facts, if there be truth in witnesses, if there be reason in man, the defendant certainly believed his life to be in extreme danger. Not thus to believe under the circumstances of this homicide would argue him insane.

Do not the facts in this case bring the defendant clearly and fully within the rule stated above? If not, is it possible for a party accused of murder to make the rule a protection, notwithstanding the verdict of the jury? Or is this rule completely within the control of the jury, to be extended to or withheld from the defendant at their pleasure, be the evidence what it may? We are of the opinion that the evidence in this case fails to show the defendant guilty of murder, but, to the contrary, if such be possible, makes a case of self-defense beyond any sort of question, and that the verdict of the jury is not supported by the evidence.

But it may be argued that, as the defendant had threatened the life of the deceased, therefore the verdict can be sustained. There is no proof that the deceased ever heard of the threats, and it is evident from what he said at the time of the killing that he did not assail the defendant because of the threats. He was breathing out threats against the defendant for having placed dirt on his (the defendant's) wife's cotton. No allusion whatever was made by either party to the threats.

But concede that the threats prompted the deceased to do what he did, will this deprive the defendant of the right of self-defense? Suppose A threatens the life of B prior to the day of the killing, and for these threats B attacks A in such manner as is calculated to induce A to believe his life is in danger, will A, because of the threats, be cut off from his right of self-defense? Who will assert such a proposition?

If, by threats or otherwise, defendant intended to, and did, produce the occasion or difficulty, with a view of killing him, his right of self-defense is gone. But there is nothing of the sort in this record.

It may be insisted that the threats prove a homicide upon former grudges, and that therefore the defendant did not believe himself in danger, and that the killing was upon malice. This is in violation of one other rule, which is that the last provocation is to be presumed to be the moving cause, when left to presumption.

In the record there is some proof of malice, evidenced only by threats made some two or three weeks prior to the killing, and a state of facts tending with great strength to establish a killing in self-defense. Which theory is supported by the evidence—that the homicide was upon malice, or was in protection of the defendant's life? The last, we think, is most evidently sustained by the facts of the case. The former is not only unsupported, but is repelled by the facts—facts uncontroverted.

A full and very liberal charge was given to the jury by the learned judge, to which there cannot be urged an objection, save as to one matter. By the fourth subdivision of Article 597 of the Penal Code, insulting words or conduct of the person killed towards a female relation of the party guilty of the homicide is made an adequate cause. This was not given in charge to the jury. Did the evidence, or any evidence in this case, require this cause to be submitted to the jury? Unquestionably it did. What said the deceased? "Get out of the way, you big bellied

bitch; it is a pity to kill three to get one." Were not these insulting words; and were they not made toward the wife of the defendant, and in his immediate presence. If so, it was the duty of the court to charge the law applicable to this matter. This omission, however, was not excepted to at the time, nor a proper charge asked, nor was it made a ground for new trial, and therefore it is not revisable.

Because the verdict of the jury is not supported by the evidence, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered January 26, 1884.